IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONNA M. RHODES,

       Plaintiff,

v.                                                                          3:13-cv-00362-PK

CAROLYN W. COLVIN,                                          FINDINGS AND
Acting Commissioner of Social Security,            RECOMMENDATION

       Defendant.

---

PAPAK, Magistrate Judge:

      Plaintiff Donna M. Rhodes filed this action March 4, 2013, seeking judicial review of the

Commissioner of Social Security's final decision denying her application for Title II disability

insurance benefits ("DIB") and Title XVI supplemental security income benefits ("SSI") under

the Social Security Act (the "Act"). This court has jurisdiction over the plaintiff's action

pursuant to 42 U.S.C. § 405(g).

      Rhodes argues the administrative law judge (the "ALJ") erred in determining the severity

of her impairments, assessing her residual functional capacity, discounting her credibility,

rejecting medical opinions from her treating physicians, and providing the vocational expert with

an inadequate hypothetical. I have considered all the parties' briefs and all the evidence in the

administrative record. For the reasons set forth below, the Commissioner's final decision should

be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

      To establish disability within the meaning of the Act, a claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a

de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482. U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, SSR 85-28, 1985 WL 56856 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

Page 3 – FINDINGS AND RECOMMENDATION

404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

### LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF EVIDENTIARY RECORD[2]

Rhodes was born on August 28, 1961. Tr. 206.[3] She received a high school diploma in 1979 and subsequently received multiple property management certificates. Tr. 239. She does not have any other formal education. Tr. 239.

Rhodes alleges a disability onset date of June 1, 2008. Tr. 63, 93. In her Disability Report (Form SSA-3368), Rhodes listed her allegedly disabling conditions as depression and diabetes with neuropathy, retinopathy, and radiculopathy. Tr. 238. She reported that, although

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

she stopped working on July 30, 2009, she believes her conditions became severe enough to preclude work beginning on June 1, 2008. Tr. 239. In response to the question, "Did your condition(s) cause you to make changes in your work activity? (for example: job duties, hours or rate of pay)," Rhodes answered, "No." Tr. 239.

Prior to her alleged disability onset date, Rhodes worked as a property manager for approximately twenty years. Tr. 63, 93, 206. In May 2008, Rhodes lost her long-standing job with Reach Community Development, Inc. ("Reach").[4] Tr. 65, 219–220, 239. At the administrative hearing on her DIB and SSI claims (the "hearing"), Rhodes testified that she was unable to maintain her job at Reach because her diabetes was "out of control" and because she was experiencing memory and focus problems that negatively impacted her productivity. Tr. 65–66.

Rhodes was first diagnosed with diabetes at age fourteen and began taking insulin around age twenty. Tr. 307, 372. On June 2, 2008, Rhodes saw John Alferes, M.D., for a routine checkup. During this appointment, Alferes made the first of what would become a long series of notes documenting Rhodes's refusal to take insulin. Tr. 335.

Aside from a self-reported 2007 incident where Rhodes allegedly went into diabetic shock while visiting Cuba, Tr. 248, the first major medical event for the purposes of Rhodes's disability claim occurred on December 12, 2008. Tr. 307. On that date, Rhodes was admitted to the emergency room at Emanuel Hospital and Health Center after a diabetic crisis. Tr. 307. Although Rhodes reported experiencing flu-like symptoms for the previous two weeks, she did not seek medical attention until her son discovered her unconscious on the floor of their home

---

[4] At the hearing, Rhodes testified that she worked for Reach for over ten years, Tr. 65, but her detailed earnings query shows that she did not begin receiving wages from Reach until 2004. Tr. 218.

Page 6 – FINDINGS AND RECOMMENDATION

and called 911. Tr. 307. Emanuel physician Ameet Jhooty, M.D.,[5] examined Rhodes and diagnosed her with acute pancreatitis, poorly controlled type two diabetes, and anemia. Tr. 305. Jhooty noted that Rhodes had a history of episodic alcohol abuse and determined that the cause of Rhodes's pancreatitis "remained obscure, though possibly related to binge drinking." Tr. 305. Similarly, Jhooty noted that Rhodes had one prior episode of pancreatitis in 2003, which was also thought to be alcohol-related. Tr. 307, 309. Rhodes reported that she was drinking three to seven drinks twice a week, smoking a pack of cigarettes a day, and not taking her insulin as prescribed. Tr. 306, 308, 311. She was discharged from Emanuel on December 15, 2008. Tr. 305.

On February 11, 2009, Rhodes followed up on her December 2008 emergency room visit with Douglas Lyon, M.D. Tr. 385. Lyon confirmed that Rhodes's pancreatitis may have been related to alcohol consumption. Tr. 387. Rhodes met with Lyon again on March 5, 2009, and Lyon referred her to diabetes education. Tr. 383. Two days later, Rhodes returned to Lyon, this time complaining of pain in her right leg. Tr. 381. Lyon noted that Rhodes had been gaining weight and had previously been diagnosed with arthritis in her back. Tr. 381.

Rhodes obtained a job with Images Properties ("Images") in June 2009, but she was unable to maintain the job for an entire week. Tr. 63, 219, 222. Rhodes described the physical demands of her job at Images as follows: reaching, sitting, writing, typing, or handling small objects for eight hours; walking or standing for five hours; climbing for two hours; stooping or crouching for one hour; and handling large objects for one-half hour. Tr. 241. She also claimed that the heaviest weight she lifted at Images was twenty-five pounds and that she frequently

---

[5] Several doctors examined Rhodes during her December 2008 hospitalization, but Jhooty performed the primary evaluation. Tr. 306, 318. None of the other doctors appear elsewhere in the medical record and are not otherwise germane to this case. Therefore, for the purpose of clarity, all medical notes from Rhodes's December 2008 hospitalization will be attributed to Jhooty.

lifted five pounds. Tr. 241. Rhodes further reported actively supervising three people at Images for one hour each day. Tr. 241.

In her Disability Report and Work Activity Report (Form SSA-821-BK), Rhodes stated that she stopped working at Images because of her medical condition and for "other reasons." Tr. 222, 239. At the hearing, Rhodes clarified that she stopped working for Images because she was assigned more responsibility than she anticipated, she was not paid overtime, she was not provided with health insurance through the company, and she was not provided with an organized work environment. Tr. 65. Rhodes further testified that all of these factors caused her stress and made her feel like she "couldn't handle" the job. Tr. 65. Aside from her brief time at Images, Rhodes was unemployed during 2009 and 2010. Tr. 62, 219.

On October 27, 2009, Rhodes consulted for the first time with general medical practitioner Ora Botwinick, M.D. Tr. 379. Botwinick noted that Rhodes was not taking her insulin as prescribed and had a history of periodic alcohol abuse. Tr. 379. Botwinick diagnosed Rhodes with chronic pancreatitis. Tr. 379–380.

On November 23, 2009, Rhodes consulted with licensed clinical social worker Gayle Keller, complaining of depression. Tr. 373. Rhodes again reported failing to adequately maintain her diabetes. Tr. 374. Keller determined that Rhodes's orientation, judgment, insight, memory, attention, concentration, and thought content were all within normal limits and diagnosed Rhodes with depressive disorder. Tr. 374.

On November 16, 2009, Rhodes returned to Botwinick, complaining of symptoms related to her diabetes and pain in her right toe. Tr. 376. Rhodes stated that she was drinking approximately once a week and had been a heavy drinker in the past. Tr. 376. Botwinick questioned Rhodes's motivation to truly control her diabetes and recommended that Rhodes keep

a diabetes logbook, undergo nutritional education, and eat smaller and more frequent meals. Tr. 376. She also drained Rhodes's right toe. Tr. 377. Rhodes returned to Botwinick on November 23, 2009, this time complaining of pain in her left toe. Tr. 374–375. Botwinick drained this toe as well and referred Rhodes to diabetes education. Tr. 375.

On December 7, 2009, Rhodes consulted with Anna Anderson, a psychiatric mental health nurse practitioner. Tr. 372. Rhodes complained that her mood had been "up and down" but reported mainly experiencing depression. Tr. 372. Rhodes reported that, "many years ago," she failed to manage her diabetes as a method of self-harm. Tr. 372. She also reported that she was drinking three to four beers once or twice a month and acknowledged being a heavy drinker in the past. Tr. 372. Anderson diagnosed Rhodes with major depressive disorder, recurrent episode. Tr. 372.

On December 21, 2009, Rhodes returned to Botwinick, complaining of pain in both her upper arms. Tr. 370. Botwinick referred Rhodes for an MRI. Tr. 370. It is unclear whether Rhodes opted out of the MRI or whether this referral precipitated the April 11 or August 30 MRIs discussed below. Botwinick also renewed her suggestion that Rhodes complete dietary education and keep a diabetes logbook. Tr. 370. Additionally, Botwinick determined that Rhodes had an ulcer on her right first toe and recommended protective footwear. Tr. 370.

On April 2, 2010, Rhodes filed her initial application for DIB and SSI, claiming that she was unable to work because of her depression and diabetes with neuropathy, retinopathy, and radiculopathy. Tr. 93, 105, 238.

On April 11, 2010, Rhodes again saw Botwinick and received an MRI of her neck. Tr. 319. Botwinick determined Rhodes had multilevel degenerative disc changes in her neck, most prominently at the C4 - C5 through C5 - C6 levels. Tr. 320. However, Botwinick found no

Page 9 – FINDINGS AND RECOMMENDATION

evidence of significant spinal stenosis and noted that Rhodes's spinal cord appeared normal.  Tr. 320.

Rhodes returned to Botwinick on April 19, 2010, this time complaining of neck and arm pain.  Tr. 368.  Botwinick noted that Rhodes was still not enrolled in diabetes classes, and referred her to physical therapy.  Tr. 369.  Rhodes followed up with Botwinick on April 26, 2010, and Botwinick again noted that Rhodes was still not keeping a logbook, eating smaller and more frequent meals, or taking her insulin as prescribed.  Tr. 367.

Rhodes returned to Keller on April 28, 2010.  Tr. 364.  Rhodes again reported not taking her medication on a regular basis.  Tr. 364.  She further reported being depressed but denied thoughts of harming herself.  Tr. 364.  That same day, Rhodes followed up with Botwinick on her diabetes treatment.  Tr. 366.  Botwinick renewed her suggestion that Rhodes eat smaller, more frequent meals and take her insulin as prescribed.  Tr. 366.

In a Function Report dated May 23, 2010, Rhodes described her daily activities as follows:

> Many days I do not get out of bed much except to go to the bathroom, however the last few weeks I am trying to improve on that.  I test my blood sugar, take medication (insulin and pills)[, and] make coffee[.]  I try to make my bed and perform simple household tasks like washing a few dishes.  Afternoons/evenings – sometimes I read a bit or watch a dvd movie [and] test [my] blood sugar several times.  I eat once a day in the late evening and try to sleep (with TV on in bedroom).  I have been going to the doctor more regularly (2–4 times monthly beginning in April 2010).  I give my bird food and water each morning.

Tr. 268.  Rhodes also reported caring for her twenty-two year old son (who was unemployed and living with her), preparing salad and canned soup four times a week, cleaning the counters and tables in her home, and folding her bedding.  Tr. 268–270.  Rhodes further reported that she was able to drive a car, go grocery shopping twice a week, and manage her money.  Tr. 271.

Additionally, Rhodes reported that, since the onset of her disability, she had been unable to dance, multitask, have an intimate relationship, keep her home clean, or walk and cook meals

Page 10 – FINDINGS AND RECOMMENDATION

as often as she used to. Tr. 269–270. Rhodes also reported that her conditions were impacting her sleep and causing her moderate difficulties in maintaining her personal hygiene. Tr. 269. Similarly, Rhodes alleged that her impairments were affecting her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb, see, remember, complete tasks, use her hands, and concentrate. Tr. 273. However, she also reported following instructions "fairly well." Tr. 273. Rhodes further reported being unable to walk farther than a block before having to rest for five minutes. Tr. 273.

On July 14, 2010, Rhodes consulted with Allen Rebekah, M.D., who diagnosed Rhodes with diabetic retinopathy. Tr. 418–420. The following week, Rhodes underwent laser surgery on her right eye to treat vision problems caused by the retinopathy. Tr. 411, 414, 485. The operation was effective and no further surgery was required. Tr. 68, 414, 441, 485.

On July 22, 2010, agency psychological consultant Bill Hennings, Ph.D., reviewed Rhodes's relevant medical records and concluded that Rhodes suffered from severe affective disorders, apparently related to her depression. Tr. 96, 108. Hennings further determined that Rhodes's ability to understand and remember detailed instructions was moderately limited. Tr. 99, 111. He therefore opined that Rhodes's tasks should be broken down into simple task sequences. Tr. 99, 111.

On July 26, 2010, agency medical consultant Sharon Eder, M.D., reviewed Rhodes's relevant medical records and concluded that Rhodes suffered from severe disorders of the back, diabetes mellitus, and obesity. Tr. 96, 108. Eder further concluded that Rhodes could lift twenty pounds occasionally; lift ten pounds frequently; perform only limited right overhead reaching; and stand, walk, or sit for six hours in an eight-hour workday. Tr. 98, 110. That same day, the Administration made an initial determination of non-disability with respect to Rhodes's DIB and

SSI claims. Tr. 102, 114. The Administration notified Rhodes of its decision two days later, on July 28, 2010. Tr. 141, 146.

On August 13, 2010, Rhodes consulted with Jessica Castle, M.D., for the first time. Tr. 413. Castle noted that Rhodes was still not taking her insulin consistently. Tr. 413–414, 416. Castle determined that Rhodes's depression was "a barrier to [a] better quality of life and better diabetes control," and she referred Rhodes to a diabetes educator, psychiatrist, and podiatrist. Tr. 417.

On August 19, 2010, Rhodes filed for reconsideration of her DIB and SSI claims, again alleging disability stemming from depression and diabetes with neuropathy, retinopathy, and radiculopathy. Tr. 115, 128. She further claimed that she began suffering from cataracts and worsening arthritis and degenerative disc disease in July 2010. Tr. 116, 129, 281.

On August 23, 2010, Rhodes returned to Botwinick, complaining of shoulder and neck pain. Tr. 408–409. Botwinick effectively treated the pain with heat and massage and referred Rhodes for an MRI. Tr. 408, 409. The MRI was performed on August 30, 2010, and it revealed mild symptoms consistent with tendinitis or micro tears. Tr. 422. It did not reveal any rotator cuff tear. Tr. 422.

On August 31, 2010, Rhodes consulted for the first time with Linda Blarjeske, a diabetes educator. Tr. 430. Blarjeske provided Rhodes with some educational materials and advice to help her better control her diabetes symptoms. Tr. 431. She recommended that Rhodes return for further consultation. Tr. 431. There is no evidence that Rhodes ever followed up with Blarjeske or any other diabetes educator.

Rhodes returned to Botwinick on September 15, 2010. Tr. 407. Botwinick noted that Rhodes had missed a recent appointment with Blarjeske. Tr. 407. Rhodes complained of

depression but stated that she preferred to stop seeing Keller and Anderson. Tr. 408. Botwinick concluded that Rhodes was "psychologically disabled now and in the past," which "impacted her ability to engage in a consistent and meaningful way to treat her poorly controlled Type 1 diabetes." Tr. 408.

On September 24, 2010, Rhodes discussed her depression with Damon Williams, a psychiatric mental health nurse practitioner. Tr. 534. Williams diagnosed Rhodes with bipolar two disorder, most recent episode major depressive, and prescribed Lamictal. Tr. 534. The diagnosis was based in large part on Rhodes's report to Williams that, during the fall of 2007, there was a ten month period where she was "partying," staying up late, "feeling on top of the world," and sleeping much less. Tr. 535. Rhodes also reported having racing thoughts. Tr. 535. Additionally, Rhodes described past periods of time where she cleaned the house more frequently, helped her friends with taxes, went out dancing, had more intimate relationships, and felt more confident and carefree. Tr. 535. Rhodes further recalled hearing that her mother was manic-depressive, and remembered her being angry and depressed. Tr. 535. Finally, Rhodes scored a sixteen on the bipolar spectrum diagnostic scale ("BSDS"). Tr. 535. The BSDS is also based entirely on self-reporting. *See* S. Nassir Ghaemi et al., *Sensitivity and Specificity of a New Bipolar Spectrum Diagnostic Scale*, 84 J. Affective Disorders 273 (2005), *available at* http://www.jad-journal.com/article/S0165-0327%2803%2900196-4/abstract.

On October 11, 2010, agency psychological consultant Kordell Kennemer, Psy.D, reviewed Rhodes's relevant medical records and concurred with Henning's initial assessment of Rhodes's psychological health and limitations. Tr. 119, 122–123, 132, 135–136.

On October 18, 2010, Rhodes met with Botwinick again, this time complaining of ongoing left shoulder pain. Tr. 533. Botwinick referred Rhodes to an orthopedic specialist. Tr.

534. That same day, agency medical consultant Neal Berner, M.D., reviewed Rhodes's relevant medical records and concurred with Eder's initial assessment of Rhodes's physical health and limitations. Tr. 119, 121, 132–134. The Administration then affirmed its previous determination of non-disability with respect to Rhodes's DIB and SSI claims. Tr. 125, 137–138. The Administration notified Rhodes of its decision the following day, October 19, 2010. Tr. 155, 159.

On November 8, 2010, Rhodes followed up with Williams about her depression. Tr. 531. Rhodes reported being depressed, struggling with financial and housing problems, taking her depression medication inconsistently, and missing two recent therapy appointments because she could not get out of bed. Tr. 531. Williams prescribed Lamictal and citalopram and suggested that Rhodes attend therapy with Keller. Tr. 531.

Rhodes met with Keller two days later. Tr. 528. Rhodes reported suicidal ideation, but explained that she would never hurt herself. Tr. 528. Keller diagnosed Rhodes with bipolar two disorder, most recent episode major depressive and prescribed therapy. Tr. 528–529. Rhodes met with Keller again on November 17, 2010. Tr. 525. Rhodes reported continuing depression and housing concerns. Keller noted that Rhodes had "not followed up on any of the resources she was given." Tr. 525.

That same day, Rhodes met with Laura Wickline, a psychiatric-mental health nurse practitioner. Tr. 526. Rhodes reported suffering from depression for two years and being socially isolated. Tr. 527. She further reported being out of glucose tablets and having no intention to refill her prescription. Tr. 527. Wickline diagnosed Rhodes with bipolar two disorder, most recent episode major depressive, and prescribed bupropion. Tr. 527.

Rhodes returned to Keller on December 1, 2010, and reported ongoing depression and concerns about her finances but feeling overall "a little better and a little more hopeful." Tr. 524. On December 15, 2010, Rhodes met with Keller again. Tr. 521. Reflecting an apparent continuation of the mental health improvement documented on December 1, Rhodes reported feeling happier, less depressed, more motivated, and more energetic. Tr. 522. Keller even noted that Rhodes was "smiling and laughing." Tr. 522.

That same day, Rhodes met with Botwinick, complaining of pain in her left arm and right hand and shoulder. Tr. 520–521. Botwinick noted that Rhodes was still eating one meal per day. Tr. 520. Rhodes also reported that she was drinking two glasses of wine every other day. Tr. 520. Botwinick concluded that the cause of Rhodes's pain was "unclear," but suspected it was related to carpal tunnel syndrome ("CTS"). Tr. 520.

On January 6, 2011, Rhodes consulted with Kathryn Hanavan, an adult nurse practitioner, about a lesion on her large right toe. Tr. 486. Rhodes reported not wearing diabetic shoes by choice. Tr. 486. Consistent with her December reports to Keller, Rhodes reported that she was taking her depression medication and felt better than she had in a long time. Tr. 486. Nevertheless, she also reported that she was still neglecting to treat her diabetes—even going so far as to not test her blood sugar for ten days. Tr. 486.

On January 27, 2011, Rhodes met with Keller again. Tr. 516. Rhodes reported obtaining financial support to pay rent and feeling less depressed, as if things were starting to "fall into place." Tr. 516. Rhodes followed up with Keller on February 7, 2011. Tr. 512. This time, she reported being upset and depressed about the recent, unexpected death of her mother. Tr. 512. Keller observed that, although Rhodes demonstrated a depressed mood, she was neatly groomed, spoke fluently, and demonstrated organized thinking. Tr. 513.

That same month, Rhodes began working as a property manager for PacifiCap Properties Group ("PacifiCap"), and she was still working there at the time of the hearing. Tr. 62, 211. Rhodes testified that she worked by herself at PacifiCap, where she independently managed a seventy-two-unit apartment complex. Tr. 68. Her daily work duties included walking through the entire property to check for maintenance issues, showing apartments to potential renters, screening applications, receiving bills, keeping records, and issuing reports. Tr. 69, 291. Rhodes testified that, although PacifiCap paid her as a full-time employee, her health problems made it difficult to actually work forty hours per week. Tr. 61–62.

Rhodes testified at the hearing that fluctuations in her blood sugar and frequent diabetes-related doctor appointments prevented her from being at work during her scheduled hours. Tr. 69–70. As a result, Rhodes was on the verge of being terminated by PacifiCap at the time of the hearing. Tr. 85, 291. Rhodes also admitted, however, that she would likely be able to work on a more regular basis if she attained better control of her blood sugar. Tr. 81–82.

Leigh Ralston, Rhodes's supervisor at PacifiCap, confirmed Rhodes's poor work performance. Tr. 291. Ralston stated that Rhodes did not properly survey the properties for maintenance issues. Tr. 291. When Ralston confronted Rhodes about the issue, Rhodes attributed her poor performance to health problems, particularly foot pain. Tr. 291. Ralston also stated that Rhodes limped and moved at a slow pace and struggled with low energy and poor focus and memory. Tr. 291.

On April 6, 2011, Rhodes met with Botwinick for a checkup. Tr. 509. Botwinick noted that Rhodes was still eating one meal per day and not taking her medications regularly. Tr. 509. On May 4, 2011, Rhodes met with Wickline, who similarly noted that Rhodes had not been

taking her depression medication, was experiencing sleep problems, and was feeling depressed. Tr. 507–508.

On June 6, 2011, Rhodes met with Megan Smith, M.D., for a shoulder examination. Tr. 477. Smith recorded that Rhodes's shoulder problems began in June 2010. Tr. 477. Rhodes reported abstaining from the exercises recommended by her physical therapist and candidly admitted she was unlikely to start doing the exercises or go to physical therapy in the future. Tr. 477, 480. Likewise, Rhodes stated that she does not "tolerate" ice and was uninterested in a steroid injection to treat her shoulder pain. Tr. 477, 480. Smith concluded that Rhodes suffered from isolated pain and decreased mobility in her left shoulder. Tr. 477. Smith diagnosed Rhodes with adhesive capsulitis. Tr. 480.

On June 22, 2011, Rhodes again met with Keller. Tr. 504. Keller determined that Rhodes was depressed and "not taking good care of herself." Tr. 504. That same day, Rhodes consulted with Botwinick about her ongoing arm pain, and Botwinick diagnosed her with CTS. Tr. 506–507. Botwinick referred Rhodes for surgery, but there is no evidence that Rhodes ever underwent the operation. Tr. 506–507.

On August 3, 2011, Rhodes consulted with Joseph Black, M.D., about an ulcer on her left foot. Tr. 503. Black noted that Rhodes had also recently developed an ulcer on the medial side of her right heel. Tr. 503. On August 5 and August 10, 2011, Rhodes attended two additional follow-up appointments at the Broadway Foot Clinic to address her heal problems. Tr. 464.

On September 1, 2011, ALJ Paul Robeck presided over a hearing on Rhodes's DIB and SSI claims. Tr. 58. Laura Aerne served as Rhodes's legal representative at the hearing. Tr. 58. A vocational expert, Amber Lebrock, also testified. Tr. 58. The ALJ issued a decision on October 6, 2011, denying Rhodes's applications for DIB and SSI. Rhodes timely requested

Page 17 – FINDINGS AND RECOMMENDATION

review of the ALJ's decision. Tr. 297. The Appeals Council denied her request on January 4,

2013. Tr. 1. As a result, the ALJ's October 6, 2010 decision became the Commissioner's final

decision for the purpose of judicial review. *See* 20 C.F.R. § 422.210(a). This action followed.

## SUMMARY OF ALJ FINDINGS

The ALJ determined Rhodes was not under a disability within the meaning of the Act at

any time relevant to the adjudication. Tr. 38, 49. As a preliminary matter, the ALJ found that

Rhodes's alleged disability onset date was June 1, 2008. Tr. 38. He further determined that

Rhodes's date last insured was December 31, 2013. Tr. 40. Thus, the adjudication period of

Rhodes's DIB application was from June 1, 2008 to December 31, 2013, and the adjudication

period of Rhodes's SSI application was from June 1, 2008 through the date of the decision. Tr.

38.

At the first step of the five-step sequential evaluation process, the ALJ found that Rhodes

did not engage in substantial gainful activity at any time following her claimed disability onset

date. Tr. 40. In reaching this conclusion, the ALJ noted that Rhodes "acknowledged returning to

full time employment and even told her social worker her new job was 'going well.'" Tr. 40.

Nevertheless, the ALJ concluded: "Although I believe the claimant is engaging in substantial

gainful activity, I am giving the claimant the benefit of the doubt and deeming work in the first

quarter of 2011 an unsuccessful work attempt." Tr. 41.

At the second step, the ALJ found that Rhodes's depression, cervical radiculopathy, and

poorly controlled diabetes with diabetic retinopathy, neuropathy and microalbuminuria were

severe for the purposes of the Act. Tr. 41.

At the third step, the ALJ determined that Rhodes did not have an impairment or

combination of impairments that met or equaled one of the listed impairments in 20 C.F.R Part

404, Subpart P, Appendix 1. Tr. 41.[6]  The ALJ next determined that Rhodes had the RFC to

perform light work as defined in 20 C.F.R §§ 404.1567(b), 416.967(b). Tr. 43.  He additionally

found that she was limited to no more than occasional overhead reaching with the right upper

extremity and to simple, repetitive tasks. Tr. 43.

Next, at step four of the sequential evaluation, the ALJ determined that Rhodes was

unable to perform past relevant work. Tr. 48.

Last, at step five, the ALJ determined there were jobs existing in significant numbers in

the national economy that Rhodes could perform. Tr. 48.  The vocational expert testified that

Rhodes would be able to perform the requirements of the representative occupations of parking

cashier (17,927 jobs regionally and 1,728,122 jobs nationally) and quotation clerk (78 jobs

regionally and 6,944 jobs nationally). Tr. 49, 86–88.  With this in mind, the ALJ concluded that

Rhodes had "not been under a disability, as defined in the Social Security Act, from June 1,

2008, through the date of this decision." Tr. 49, *citing* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## ANALYSIS

### I.    Step Two: Severity of the Claimant's Impairments

Rhodes first argues the ALJ erred at step two by finding that her CTS, adhesive

capsulitis, foot ulcers, pancreatitis, and bipolar syndrome were non-severe and by failing to

consider the combined effects of all her impairments. Pl.'s Opening Br. 4–8.

The ALJ did not err in determining that Rhodes's CTS was non-severe, as Rhodes did

not satisfy her burden of proving to the contrary. *See Tackett*, 180 F.3d at 1098 (holding that the

---

[6] Although Rhodes does not expressly challenge this determination, she appears to suggest in her opening brief that the ALJ erred in disregarding Castle's opinion that Rhodes met the regulatory listing for diabetes. Pl.'s Opening Br. 16, *citing* Tr. 466. However, the ALJ accurately determined that Castle cited a listing that was no longer the applicable law. *See* Tr. 45; Revised Medical Criteria for Evaluating Endocrine Disorders, 76 Fed. Reg. 19692-01, 19696 (Apr. 8, 2011).

claimant bears the burden of proving her impairment is severe); 20 C.F.R. §§ 404.1520(c), 416.920(c) (defining severe impairments as those that significantly limit a claimant's ability to perform basic work activities). As stated above, Rhodes was diagnosed with CTS on June 22, 2011. Tr. 506–507. However, the only evidence that Rhodes's CTS limited her ability to work is Rhodes's reports to physicians that it caused her pain and discomfort. The ALJ was entitled to reject these reports because, as discussed below, he properly discredited Rhodes's testimony regarding pain. *See infra* Part III.; *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("An ALJ cannot be required to believe every allegation of disabling pain . . . . [M]any medical conditions produce pain not severe enough to preclude gainful employment."). Substantial evidence therefore supports the ALJ's conclusion that Rhodes's CTS was not severe.

The ALJ likewise did not err in determining that Rhodes's adhesive capsulitis was not severe. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ discussed the August 2010 MRI of Rhodes's shoulder, subsequent diagnoses, and prescribed treatments. Tr. 41. Thus, the ALJ conducted a "careful evaluation of the medical record describing the impairments" and was consequently permitted to make "an informed judgment about the extent to which the impairments limit [Rhodes's] work activities." SSR 85-28, 1985 WL 56856, at *4 (1985). [7]

Again, it was Rhodes's burden to prove that her shoulder pain was severe. *See Tackett*, 180 F.3d at 1098. Although Rhodes was diagnosed with adhesive capsulitis and reported that her shoulder pain limited her work abilities, medical records unambiguously reflect Rhodes's unwillingness to treat her shoulder pain with home exercises, physical therapy, steroid injections,

---

[7] Social Security Rulings "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" of the Administration. 20 C.F.R. § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs). They "reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations." *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006), *quoting Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n. 2 (9th Cir. 2005). Although they do not carry the force of law, SSRs are binding on ALJs nonetheless. *See Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

or even ice. Tr. 477, 480. Those records constitute "such relevant evidence as a reasonable person might accept as adequate to support a conclusion" that Rhodes's adhesive capsulitis was not severe. *Lingenfelter*, 504 F.3d at 1035 (discussing the standard for substantial evidence), *citing Robbins*, 466 F.3d at 882.

Furthermore, the ALJ properly considered the combined limiting effects of Rhodes's CTS and adhesive capsulitis. *See* 42 U.S.C. § 423(d)(2)(B); SSR 86-8, 1986 WL 68636, at **4–6; SSR 85-28, at *4. After discussing the medical records pertaining to those impairments, the ALJ concluded:

> These conditions, **considered singly or in combination** have caused only transient and mild symptoms and limitations, . . . do not have greater than a minimal limitation on the claimant's physical or mental ability to perform basic work activities, or are otherwise not adequately supported by the medical evidence of record. Accordingly, these impairments do not constitute severe medically determinable impairments.

Tr. 41 (emphasis added). Importantly, the ALJ did not consider the individual or combined limiting effects of Rhodes's foot ulcers, pancreatitis, or bipolar disorder at step two. However, as discussed below, the ALJ was not required to consider these impairments at any step of the sequential evaluation. *See infra* Part II.C–E.

Even assuming *arguendo* that the ALJ did err at step two, the error would be harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations omitted) (internal quotation marks omitted) (holding that "an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination"). Rhodes's claim advanced to the next step of the sequential analysis because the ALJ determined Rhodes suffered from other severe impairments. *See Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) ("[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims."), *citing Bowen*, 482 U.S. at 153. In the RFC assessment, the ALJ properly considered the limiting effects of all Rhodes's

impairments that could support an award of benefits, and any error at step two would therefore

be "inconsequential to the ultimate nondisability determination." *See Molina*, 674 F.3d at 1115.

## II.    Residual Functional Capacity

Rhodes next argues the ALJ erred in the RFC assessment by failing to assess Rhodes's

work-related abilities on a function-by-function basis. Pl.'s Opening Br. 18. Rhodes contends

that the ALJ was required expressly to assess her ability to walk, sit, stand, and lift before

determining that she retained a functional capacity to do light work. Pl.'s Opening Br. 18.

Additionally, Rhodes alleges the ALJ erred in the RFC assessment by failing to expressly

consider the limiting effects of her CTS, adhesive capsulitis, foot ulcers, pancreatitis, and bipolar

disorder. Pl.'s Opening Br. 5; Pl.'s Reply Br. 1–6.

### A.    Function-by-Function Analysis

Rhodes is correct that "[t]he RFC assessment must first identify the individual's

functional limitations or restrictions and assess his or her work-related abilities on a function-by-

function basis . . . ." SSR 96-8p, at *1; *accord Reddick*, 157 F.3d at 724. However, in this case,

the ALJ performed a sufficient function-by-function assessment. *See* Tr. 43–46. "SSR 96-8p

requires only that the ALJ discuss how evidence supports the [RFC] assessment and explain how

the ALJ resolved material inconsistencies or ambiguities in evidence . . . ." *Mason v. Comm'r of*

*Soc. Sec.*, 379 F. App'x 638, 639 (9th Cir. 2010) (unpublished disposition); *accord Petty v.*

*Colvin*, CV-12-02289-PHX-BSB, 2014 WL 1116992, at *20 (D. Ariz. Mar. 17, 2014) (citation

omitted); *McAlister v. Astrue*, CV 10-4932 AGR, 2011 WL 3807577, at *2 n.2 (C.D. Cal. Aug.

26, 2011) (citation omitted).

Here, the ALJ expressly considered all the medical evidence pertaining to Rhodes's

ability to sit, stand, walk, and lift. Tr. 45. The ALJ relied on the functional assessments

provided by agency examiners because they were "consistent with the overall medical record, including imaging results and any limitations imposed by the ancillary conditions caused by the claimant's diabetes." Tr. 45. The ALJ rejected a functional assessment provided by Castle, reasoning that it was inconsistent with the overall medical record and irreconcilable with Rhodes's work history, daily activities, and failure to obtain recommended medical treatment. Tr. 45–46. As discussed below, the ALJ provided specific and legitimate reasons, supported by substantial evidence, for rejecting Castle's functional assessment. *See infra* Part IV. Therefore, the ALJ's function-by-function assessment satisfied the mandates of SSR 96-8p. *See Mason*, 379 F. App'x at 639 (unpublished disposition); *Petty*, 2014 WL 1116992, at *20 (citation omitted); *McAlister*, 2011 WL 3807577, at *2 n.2 (citation omitted).

**B.    CTS and Adhesive Capsulitis**

Rhodes is also correct that the ALJ was required to consider the limitations imposed by all of her impairments—regardless of severity—in assessing her RFC. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008), *citing* SSR 96-8p, at *5. However, Rhodes's argument that the ALJ did not consider her CTS or adhesive capsulitis in the RFC assessment is groundless. After analyzing all the evidence regarding Rhodes's CTS and adhesive capsulitis, the ALJ expressly stated, "the residual functional capacity determined in this decision has been reduced to accommodate limitations resulting from these conditions." Tr. 41–44. Nothing more was required.

**C.    Foot Ulcers**

The ALJ was not required to consider the limiting effects of Rhodes's foot ulcers, as Rhodes failed to prove they were a disabling condition under the Act. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which . . . can be expected

to last for a continuous period of not less than 12 months . . ."); *Burch v. Barnhart*, 400 F.3d 676,

679 (9th Cir. 2005) (citation omitted) ("The claimant carries the initial burden of proving a

disability in steps one through four of the analysis."). Rhodes was treated for foot ulcers once in

2004 (Tr. 246), once in 2009 (Tr. 371), and several times in the spring and summer of 2011 (Tr.

464, 486, 503, 511). Castle's note that Rhodes did not present foot sores at her October 14, 2010

appointment is further evidence of the noncontinuous nature of the ulcers. *See* Tr. 493. Taken

together, these records constitute substantial evidence that Rhodes's ulcers could not be expected

to last for twelve months. *See* 42 U.S.C. § 423(d)(1)(A).

Equally important, Rhodes testified at the hearing that the ulcers only came back if she

wore normal shoes. Tr. 67. As stated above, Rhodes opted not to follow her doctors' advice to

wear diabetic shoes. Tr. 486. Therefore, the ulcers are not an impairment that could support an

award of benefits. *See Warre v. Comm'r of Soc. Sec. Amdmin.*, 439 F.3d 1001, 1006 (9th Cir.

2006) (citations omitted) ("Impairments that can be controlled effectively with medication are

not disabling for the purpose of determining eligibility for SSI benefits."); *Osenbrock v. Apfel*,

240 F.3d 1157, 1162, 1167 (9th Cir. 2001) (holding that a lack of self-discipline and will power

is not an impairment, it is a lifestyle choice).

Additionally, although not required to, the ALJ did give some consideration to Rhodes's

foot ulcers in the RFC assessment. The ALJ specifically cited medical records showing Rhodes

had "a history of foot ulcers on the left first toe and numbness in her legs with intermittent sharp

pains." Tr. 44. Moreover, the ALJ expressly considered a statement from Ralston that Rhodes

"limps and moves slowly because of foot pain." Tr. 46. Therefore, the ALJ's decision

demonstrates, albeit somewhat laconically, that he considered how Rhodes's foot ulcers limited

her "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, at *1.

Finally, even if the court were to accept Rhodes's argument that the ALJ did not address the limiting effects of her foot ulcers with sufficient specificity in his written decision, Rhodes has not proven the error was harmful. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (holding that the claimant bears the burden of proving harmful error), *citing Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Prior to assessing Rhodes's RFC at the hearing, the ALJ considered testimony from Rhodes that her ulcer made walking difficult and was an active problem. Tr. 80–81. As discussed below, the ALJ went on to discredit Rhodes's pain and symptom testimony. Therefore, the ALJ actually considered the ulcer's limiting effects in assessing Rhodes's RFC, and his failure to include a detailed discussion of that consideration in his decision is "inconsequential to the ultimate nondisability determination." *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

### D.    Pancreatitis

The ALJ did not err by failing to expressly consider the limiting effects of Rhodes's pancreatitis in his written decision. As with her foot ulcers, Rhodes failed to establish that her pancreatitis was a disabling condition. *See* 42 U.S.C. § 423(d)(1)(A); *Burch*, 400 F.3d at 679. The record shows only two instances of pancreatitis. The first is based on medical history[8] that indicates Rhodes was treated for acute pancreatitis in 2003. Tr. 307. The second instance pertains to Rhodes's 2008 diabetic episode, where she was also diagnosed with acute pancreatitis. Tr. 305. Thus, there is no evidence that Rhodes's pancreatitis could be expected to last for

---

[8] It is unclear whether the medical history was documented or self-reported. *See* Tr. 307.

twelve months.[9]  *See* 42 U.S.C. § 423(d)(1)(A); *see also Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1992) (upholding the ALJ's finding of no disability where the impairments were stabilized).  Consequently, the ALJ was not required to consider Rhodes's pancreatitis in the RFC assessment.  *See also Fair*, 885 F.2d at 603 ("An ALJ cannot be required to believe every allegation of disabling pain, . . . many medical conditions produce pain not severe enough to preclude gainful employment.").

Furthermore, the ALJ concluded that Rhodes's pancreatitis was "likely related to binge drinking alcohol."  Tr. 47.  As discussed above, this conclusion is supported by numerous medical notes from treating and examining physicians who suspected both instances of pancreatitis were alcohol related.  Tr. 305, 307, 309, 378–380, 385.  At the hearing, Rhodes admitted to drinking in excess shortly before her 2008 acute pancreatitis diagnosis, and adamantly asserted that, "for a very long time now," she hardly drinks at all.  Tr. 74.  Considering that assertion in conjunction with the fact that Rhodes was last treated for pancreatitis in 2008, there is substantial evidence that alcohol was a material contributing factor to Rhodes's pancreatitis.  *See* 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.").  Thus, because Rhodes's pancreatitis ceased once she stopped using alcohol, it is not an impairment that could support a finding of disability, and the ALJ was permitted to disregard it.  *See, e.g., Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001), *citing* 20 C.F.R. § 404.1535.

---

[9] On October 27, 2009, Botwinick diagnosed Rhodes with chronic pancreatitis, Tr. 379–380, and that diagnosis was subsequently repeated in the medical history notes of other doctors. Tr. 442–443, 477. However, the diagnosis was not predicated on a new pancreatic episode and neither Botwinick nor the subsequent examining physicians provided any medical basis for advancing the diagnosis from acute to chronic. Therefore, the ALJ was entitled to disregard the diagnosis. *See Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."). *See also infra* Part IV.

### E.   Bipolar Disorder

The ALJ did not err by failing to address the limiting effects of Rhodes's bipolar disorder. As established above, on November 24, 2010, Williams diagnosed Rhodes with bipolar two disorder, most recent episode major depressive. Tr. 535. However, Rhodes failed to prove that her bipolar disorder—as distinguishable from her depression—limited her ability to engage in gainful activity. *See Burch*, 400 F.3d at 679 (citation omitted) ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis."). There is no evidence in the record that Rhodes's bipolar disorder had any limiting effect on her ability to work. Tellingly, Rhodes did not allege that the disorder limited her ability to work in either her initial Disability Report or the Disability Report in support of her appeal. *See* Tr. 238, 278.

More important, every medical note discussing Rhodes's bipolar disorder states that her most recent episode was "major depressive." Tr. 504, 508, 516–518, 522–524, 526–532, 534. The only documented hypomanic episode in the record is based on Rhodes's report to Williams about events that occurred years before Rhodes's alleged disability onset date. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 397 (4th ed. 2000) (defining bipolar two disorder). As discussed below, the ALJ properly discredited Rhodes's testimony about the limiting effects of her pain and symptoms. Therefore, the only limitations Rhodes proved in relation to her bipolar disorder are those caused by its depressive component. The ALJ determined that Rhodes's depression was severe and extensively analyzed its limiting effects in the RFC assessment. Tr. 41, 45–46. Consequently, substantial evidence supports the ALJ's decision not to address the manic component of Rhodes's bipolar disorder. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for

medical conditions or impairments that the ALJ found neither credible nor supported by the

record is unnecessary."), *citing* SSR 96-8p.

### III.    The Claimant's Credibility

Rhodes next challenges the ALJ's conclusion that Rhodes's testimony about pain and

symptoms was not entirely credible.  Pl.'s Opening Br. 9–14.  The Ninth Circuit recently

reiterated the standards governing an ALJ's assessment of a disability claimant's credibility:

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether there is "'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "'specific, clear and convincing reasons'" in order to reject the claimant's testimony about the severity of the symptoms. *Id.* (quoting *Lingenfelter,* 504 F.3d at 1036).

*Molina,* 674 F.3d at 1112.

In this case, after finding that Rhodes's medically determinable impairments caused

symptoms that could reasonably be expected to produce her pain, the ALJ determined that

Rhodes's noncompliance with recommended medical treatment, work history, daily activities,

and inconsistent statements undermined her allegation of disabling pain.  Tr. 43, 47.

#### A.    Failure to Follow the Recommended Course of Treatment

Failure to follow a prescribed course of treatment can be a clear and convincing reason

for discounting a claimant's credibility.  *See Bunnell v. Sullivan,* 947 F.2d 341, 346 (9th Cir.

1991), *quoting Fair,* 885 F.2d at 603.  Before denying benefits because of failure to follow

medical advice, the ALJ must first examine the medical conditions and personal factors that bear

on whether a claimant can reasonably remedy her impairment.  *Dodrill v. Shalala,* 12 F.3d 915,

919 (9th Cir. 1993) (citation omitted).  However, a claimant's failure to assert a legitimate reason

for not following a prescribed course of treatment, or a finding by the ALJ that the alleged reason

Page 28 – FINDINGS AND RECOMMENDATION

is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603.

Here, Rhodes's failure to follow recommended medical treatment is a specific, clear and convincing reason for discounting her credibility. The ALJ determined that Rhodes's conservative course of treatment was most strongly evidenced by her failure to take insulin. Tr. 44. The ALJ cited eleven medical records from five different physicians that documented Rhodes's failure to take insulin. Tr. 44. Additionally, the ALJ cited Rhodes's June 6, 2011 consultation with Smith as further evidence of Rhodes's failure to comply with treatment. Tr. 41. As stated above, Smith diagnosed Rhodes with adhesive capsulitis, and Rhodes candidly admitted that she was uninterested in treating the condition with steroid injections, physical therapy, home exercises, or even ice. Tr. 477, 480. Finally, the ALJ also relied on evidence of Rhodes's failure to follow her doctors' advice to eat smaller and more frequent meals, enroll in diabetes education, and wear diabetic footwear. Tr. 44, 47.

At the hearing, Rhodes contended that her failure to take insulin was caused by her depression. Tr. 79. Castle and Botwinick expressed similar opinions. Tr. 408, 437. However, as established above, medical records show that in December 2010 and January 2011, Rhodes reported taking her depression medication and feeling happier, less depressed, more motivated, and more energetic. Tr. 486, 521–522. Nevertheless, during that same time, Rhodes also admitted that she was still neglecting to treat her diabetes—even going so far as to not test her blood sugar for ten days. Tr. 486. Furthermore, Rhodes attended at least sixty-three doctor appointments between her initial disability claim and the hearing. Many of these appointments were non-urgent follow-ups. Therefore, the ALJ was entitled to reject Rhodes's justification for her selective non-compliance with medical treatment, and substantial evidence supports his

adverse credibility finding. *See Tommasetti*, 533 F.3d at 1039–1040; *Fair*, 885 F.2d at 603; *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999).

### B.    Work History

Rhodes's work history also supports the ALJ's credibility determination, as it is inconsistent with Rhodes's allegation that she is completely unable to work. *See Thomas*, 278 F.3d at 959; *Zamora v. Astrue*, 853 F. Supp. 2d 1048, 1061 (D. Or. 2011). Work history is particularly relevant to a credibility determination when, as is the case here, the claimant's daily work activities are exactly what she is alleging she cannot do. *See Zamora*, 853 F. Supp. 2d at 1061.

As discussed above, from February 2011 through the time of the hearing, Rhodes was a full-time employee at PacifiCap, where she independently managed a seventy-two-unit apartment complex. Tr. 61–62. Rhodes's daily work duties at PacifiCap included walking the entire property to check for maintenance issues, showing apartments to potential renters, screening applications, receiving bills, keeping records, and issuing reports. Tr. 69, 241, 291. These activities suggest a higher level of functioning than Rhodes alleged. Specifically, they contradict Rhodes's assertion that she could no longer work because she was unable to walk, concentrate, or have meaningful social interactions with others. *See* Tr. 65–66, 273.

The fact that Rhodes was experiencing some difficulties performing her job at PacifiCap does not preclude that job from serving as a basis of the ALJ's credibility determination. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010) (holding that, even where daily activities suggest some difficulty functioning, they may still support an adverse credibility determination if they contradict an allegation of total disability); *Valentine v. Comm'r Soc. Sec. Admin*, 574 F.3d 685, 693 (9th Cir. 2009) (same). The significance of Rhodes's purported

Page 30 – FINDINGS AND RECOMMENDATION

difficulties at PacifiCap is further undermined by Rhodes's admission at the hearing that she would not miss as much work at PacifiCap if she properly controlled her blood sugar. Tr. 81–82. *See, e.g.*, *Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); *Sample*, 694 F.2d at 642 (upholding the ALJ's finding of no disability where the impairments were stabilized).

To be sure, Rhodes's failed work attempt alone is not a clear and convincing reason for rejecting her subjective pain and symptom testimony. *See Lingenfelter*, 504 F.3d at 1038–1039. However, this court and the Ninth Circuit have consistently held that work history, even a failed work attempt, is a proper consideration in the ALJ's credibility determination. *See Thomas*, 278 F.3d at 959 (holding that work history is a relevant consideration in assessing a claimant's credibility); *Caldwell v. Astrue*, 804 F. Supp. 2d 1098, 1104 (D. Or. 2011) (upholding an adverse credibility finding where claimant's continued performance of "odd jobs" for money contradicted his allegations of debilitating pain). Therefore, Rhodes's work history, while not sufficient on its own to impeach her credibility, lends further support to the ALJ's ultimate credibility determination. *Cf. Lingenfelter*, 504 F.3d at 1038–1039 (holding that a failed work attempt cannot be the *sole* factor supporting an adverse credibility finding); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (holding that the ALJ is only required to provide one clear and convincing reason for discounting a claimant's credibility); *Caldwell*, 804 F. Supp. 2d at 1104 (same).

## C.    Activities of Daily Living

I agree with Rhodes that her daily activities do not support the ALJ's adverse credibility determination. The ALJ did not determine that the activities could be transferred to a work

setting. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) ("The ALJ must make 'specific

findings relating to [the daily] activities' and their transferability to conclude that a claimant's

daily activities warrant an adverse credibility determination."), *quoting Burch*, 400 F.3d at 681.

Additionally, the activities do not contradict Rhodes's testimony or allegations. *See id.*

(discussing the two ways activities of daily living can support an adverse credibility

determination). Rhodes only drove and shopped occasionally, prepared very simple meals,

managed a diminutive amount of money, and performed minimal housework. Tr. 268–271. *See*

*Molina*, 674 F.3d at 1113 ("[A] claimant need not 'vegetate in a dark room' in order to be eligible

for benefits . . . ."), *citing Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987); *Reddick*, 157 F.3d

at 722 ("Only if the level of activity were inconsistent with Claimant's claimed limitations would

these activities have any bearing on Claimant's credibility."). However, the error was harmless,

as the ALJ was only required to provide one clear and convincing reason to discount Rhodes's

credibility. *See Bray*, 554 F.3d at 1227.

    **D.**    **Inconsistent Testimony**

    Inconsistent statements about alcohol abuse can constitute a clear and convincing reason

for discrediting a disability claimant. *See, e.g., Thomas*, 278 F.3d at 959; *Verduzco v. Apfel*, 188

F.3d 1087, 1090 (9th Cir. 1999). However, mere equivocation about alcohol abuse alone cannot

support an adverse credibility determination. *Compare Robbins*, 466 F.3d at 884 n.2 (rejecting

the ALJ's credibility determination when it was based on a finding that the claimant equivocated

about his alcohol abuse), *with Thomas*, 278 F.3d at 959 (upholding the ALJ's credibility

determination when it was based on directly contradictory and inconsistent statements about drug

and alcohol use).

    In this case, the ALJ concluded:

> Finally, the claimant's overall credibility is undermined by her episodic alcohol abuse and her inconsistent statements and testimony about such . . . .  In November of 2009, she acknowledged drinking maybe once a week [Tr. 376]; the following month, she said it was once or twice a month [Tr. 372].  At hearing, the claimant's testimony was vague, and changed with further questioning.  Initially, she said she was not really drinking.  Then she stated she was basically a wild woman after her divorce, drinking a lot; she then said her ex-husband was an alcoholic, and she went out drinking with him quite often.

Tr. 47–48.

Rhodes's November and December 2009 statements about drinking are not inconsistent and therefore cannot serve as basis for discrediting her testimony.  *See Robbins*, 466 F.3d at 884 n.2 (holding that the record merely suggested the claimant "had a history of excessive alcohol use, punctuated by periods of sobriety followed by relapse, and generally had 'poor insight into his alcoholic problems'").  As in *Robbins*, Rhodes's statements merely suggest that she was drinking more in November 2009 than she was in December 2009.  *See id.*

However, Rhodes's inconsistent, vague, and elusive testimony at the hearing does lend clear and convincing support to the ALJ's credibility determination.  *See Tommasetti*, 533 F.3d at 1040 (holding that a claimant's vague testimony at the hearing can undermine her credibility), *citing Smolen*, 80 F.3d at 1284; *see also Bray*, 554 F.3d at 1227 (holding that the ALJ is only required to provide one clear and convincing reason to discount a claimant's credibility).  As the ALJ noted, Rhodes initially stated that she had never been intoxicated over the "past few years." Tr. 74.  After the ALJ confronted her with Botwinick's notes suggesting Rhodes's pancreatitis was caused by alcohol abuse, Rhodes confessed that there was a three or four month period in late 2008 when she was drinking in excess.  Tr. 74–75.  When asked if that was the only time when she was drinking more than usual, Rhodes responded: "Yes, for the most part."  Tr. 76.  Naturally, this prompted the ALJ to prod further, which revealed another previously undisclosed period of Rhodes's drinking.  Tr. 77.  This series of statements lends further support to the ALJ's

credibility determination, as it demonstrates Rhodes's lack of candor. *See Tommasetti*, 533 F.3d at 1040; *Thomas*, 278 F.3d at 959.

All in all, Rhodes's noncompliance with recommended medical treatment, work history, and inconsistent statements about alcohol abuse constitute specific, clear and convincing reasons supported by substantial evidence for discounting her credibility. *See Molina*, 674 F.3d at 1112 (discussing the standards governing an ALJ's determination of a claimant's credibility).

**IV.    Medical Opinions of Doctors Botwinick and Castle**

Rhodes next argues that the ALJ erred in rejecting the opinions of treating physicians Castle and Botwinick. Pl.'s Opening Br. 14–16. In support of this argument, Rhodes contends that the ALJ was required to provide clear and convincing reasons for rejecting both doctors' opinions. Pl.'s Reply Br. 9.

There are three types of physicians: treating, examining, and nonexamining. The opinions of each are afforded different weight. *See Valentine*, 574 F.3d at 692; *Lester v. Chater*, 81 F.3d 821, 830–831 (9th Cir. 1996). The ALJ gives "controlling weight" to a treating doctor's opinion where medically-approved, diagnostic techniques support the opinion and the opinion is not inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); *Lingenfelter*, 504 F.3d at 1038 n.10. However, even where a treating physician's opinion is contradicted by competent medical evidence, it is still entitled to deference. *See* 20 C.F.R. § 404.1527(d)(2); *Orn*, 495 F.3d at 631–632, *quoting* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

Consequently, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by substantial evidence in the record. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Likewise, a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by

substantial evidence in the record. *See Valentine*, 574 F.3d at 692. "The ALJ can meet [the latter] burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (internal quotation marks omitted), *quoting Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). Although a treating physician's opinion on the ultimate issue of disability is not controlling, the ALJ cannot reject it without satisfying the same standards required for rejecting the doctor's objective medical opinion. *Reddick*, 157 F.3d at 725; *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993), *quoting Montijo v. Sec'y of Health & Human Servs.*, 729 F.2d 599, 601 (9th Cir. 1984) (per curiam).

In this case, Botwinick opined that Rhodes was "psychologically disabled." Tr. 408. Both Botwinick and Castle opined that Rhodes's depression prevented her from effectively treating her diabetes. Tr. 408, 437. Castle also opined that Rhodes could not walk or stand for more than fifteen minutes at one time or more than one hour in an eight-hour day and that Rhodes would miss more than two days a month from even a sedentary job because of her impairments. Tr. 467–468.

Conversely, as stated above, the agency medical examiners opined that Rhodes could lift and carry twenty pounds occasionally and ten pounds regularly, that she could stand, walk, or sit about six hours each in an eight hour day, and that she was limited to no more than occasional overhead reaching with her right upper extremity. Tr. 110, 119 121, 132–134. With respect to Rhodes's psychological condition, the examiners found that she had moderate difficulties in maintaining concentration, persistence, and pace. Tr. 119, 132. They further found that she was able to understand and carry out only short instructions, so tasks should be broken down into simple task sequences. Tr. 111, 119, 122–123, 135–136.

Following analysis of this evidence, the ALJ concluded that both treating physicians' opinions were entitled to little weight. Tr. 45–46. The ALJ determined that Castle's opinion was inconsistent with the overall medical record, the opinions of the agency medical examiners, Rhodes's failure to comply with medical treatment, and Rhodes's activities of daily living and then-current work. Tr. 45. Similarly, the ALJ reasoned that Botwinick's opinion was not adequately supported by the medical evidence and failed to account for Rhodes's activities of daily living and then-current work. Tr. 46. Finally, the ALJ considered that neither Castle nor Botwinick specialized in psychology. Tr. 46.

Rhodes's argument that the ALJ was required to provide clear and convincing reasons for rejecting the opinions of Botwinick and Castle is without merit. As already discussed, the opinions of Castle and Botwinick are directly contradicted by those of the agency medical examiners. Thus, the ALJ was only required to provide specific and legitimate reasons for rejecting the treating physicians' opinions. *See Valentine*, 574 F.3d at 692; *Orn*, 495 F.3d at 632 (citations omitted).

The ALJ provided specific and legitimate reasons for rejecting the opinions of both Castle and Botwinick. First, the ALJ provided a detailed, thorough summary of the medical evidence. Tr. 43–46. He then interpreted the medical evidence against the backdrop of Rhodes's work history, activities of daily living, and failure to follow medical treatment. Tr. 44, 47. With all the evidence in mind, the ALJ found that the opinions of the agency physicians more accurately represented Rhodes's true level of impairment than did the opinions of Castle or Botwinick. Tr. 45. The ALJ therefore satisfied his burden of providing specific legitimate reasons for rejecting the opinions of both Castle and Botwinick. *See Magallanes*, 881 F.2d at 751 ("The ALJ can meet this burden by setting out a detailed and thorough summary of the facts

and conflicting clinical evidence, stating his interpretation thereof, and making findings." (internal quotation marks omitted)), *quoting Cotton,* 799 F.2d at 1408.

Additionally, Castle's opinion on Rhodes's physical health is contained in a standardized (albeit outdated, *see supra* note 6) check-the-box form. Tr. 467–468. Castle did not provide any explanation or supporting evidence for her RFC assessment. As a result, the ALJ was entitled to reject it. [10] *See Crane v. Shalala,* 76 F.3d 251, 253 (9th Cir. 1996) (holding that an ALJ may permissibly reject standard check-off forms); *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) ("[T]he regulations give more weight to opinions that are explained than to those that are not.").

Moreover, neither Castle nor Botwinick explained or supported their cursory opinions about Rhodes's depression and its effect on Rhodes's ability to treat her diabetes. *See Corso v. Colvin,* 3:13-CV-250-AC, 2014 WL 950029, at *9 (D. Or. Mar. 11, 2014) ("It is well-established that an ALJ may afford less weight, even where a treating physician is involved, to opinions that are not accompanied by explanations or references to clinical findings."), *citing Crane*, 76 F.3d at 253. As discussed above, these opinions are directly at odds with substantial medical evidence of Rhodes effectively treating her depression and simultaneously failing to take her insulin. Therefore, the ALJ was not required to accept the "brief, conclusory, and inadequately supported" opinions of Castle and Botwinick about the effect of Rhodes's depression. *Bray*, 554 F.3d at 1228; *see also Holohan*, 246 F.3d at 1202; *Corso*, 2014 WL 950029, at *9, *citing Crane*, 76 F.3d at 253.

---

[10] Of course, this court is constrained to review the reasons asserted by the ALJ. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). In this case, the ALJ did not expressly state that he was rejecting Castle's opinion because it was provided on a standardized form that did not include any supporting findings. However, this court has never held an ALJ to such an exacting standard in the context of rejecting a treating physician's opinion. *See, e.g., Corso v. Colvin*, 3:13-CV-250-AC, 2014 WL 950029, at *9 (D. Or. Mar. 11, 2014). It is sufficient that the ALJ in this case rejected Castle's testimony because it was inconsistent with the overall medical record, Rhodes's failure to follow recommended medical treatment, and Rhodes's then-current work. *See id.*

Finally, the ALJ correctly considered that both Castle and Botwinick lacked psychological expertise. As stated above, Botwinick is a general practitioner and Castle is an endocrinologist. By contrast, the agency medical examiners who evaluated Rhodes's mental RFC both specialized in psychology. Tr. 100, 112, 123, 136. Of course, any competent, licensed physician is qualified to state an opinion on a claimant's mental health. *See, e.g.*, *Crane*, 76 F.3d at 254; *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Nevertheless, the ALJ was permitted to accept the experts' opinions over the non-experts' opinions. *See McCawley v. Astrue*, 423 F. App'x 687, 689 (9th Cir. 2011) (unpublished disposition), *citing Holohan*, 246 F.3d at 1202 n. 2; *Bunnell*, 912 F.2d at 1153 (holding that the opinion of an examining physician specializing in the relevant area of medicine may properly be accepted over the opinion of a treating physician with no expertise in the relevant area), *citing Lombardo v. Schweiker*, 749 F.2d 565, 566 (9th Cir. 1984), *superseded on other grounds*, 947 F.2d 341 (9th Cir. 1991).

To be sure, Castle did offer evidence in support of her opinion that Rhodes's impairments would cause her to miss more than two days of work per month. Tr. 468. However, the only evidence Castle provided was: "As of last visit [on] 7/26/11, [Rhodes] was being seen weekly by a podiatrist for treatment of foot ulcers." Tr. 468. The ALJ permissibly rejected this portion of Castle's opinion because it did not take into account Rhodes's choice to not follow her doctors' advice to wear diabetic shoes. Tr. 67, 486; *see also Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); *Sample*, 694 F.2d at 642 (upholding the ALJ's finding of no disability where the impairments were stabilized). Similarly, Castle's opinion about Rhodes's ability to attend work is further undermined by Rhodes's admission at the hearing that she would not miss as much work at PacifiCap if she properly controlled her blood sugar. Tr. 81–82.

Substantial evidence therefore supports the ALJ's specific and legitimate reasons for rejecting the opinions of Castle and Botwinick.

## V.    Step Five: Existence of Jobs the Claimant Could Perform in the National Economy

In light of the foregoing discussion, Rhodes's final argument that the ALJ erred at step five of the sequential evaluation is necessarily unavailing. The argument is entirely dependent on the success of the aforementioned arguments, all of which the court has now rejected. *See Magallanes*, 881 F.2d at 756–757 (holding that it is proper for an ALJ to limit a hypothetical to only those restrictions that are supported by substantial evidence in the record).

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decisions in connection with Rhodes's applications for DIB and SSI be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

/ / /

/ / /

/ / /

/ / /

/ / /

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 27th day of June, 2014.

Honorable Paul Papak
United States Magistrate Judge.